IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 24, 2019 Session

## STATE OF TENNESSEE v. JAMAR LAQUINN FRAZIER

**Appeal from the Criminal Court for Knox County**
**No. 99921     G. Scott Green, Judge**

_____

### No. E2018-00202-CCA-R3-CD

_____

The Defendant, Jamar Laquinn Frazier, was convicted by a Knox County Criminal Court jury of first degree premeditated murder. *See* T.C.A. § 39-13-202 (2014). He received a life sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erred by admitting evidence in violation of the Tennessee Rules of Evidence, and (3) the trial court erred by providing a jury instruction on flight. Although we conclude that the evidence is sufficient to support the Defendant's conviction, we conclude that the trial court erred by admitting evidence related to the Defendant's previous gun possession and to the Defendant's possible involvement in the killing of a witness to the shooting in this case. We reverse the judgment of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed:**
**Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, Jamar Laquinn Frazier.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Charme Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case arises from the July 3, 2012 killing of Christopher Melton in Knox County. The Defendant was arrested in Chattanooga and charged with first degree premeditated murder. At the January 19, 2016 jury trial, a recording of a 9-1-1 call was received as an exhibit and played for the jury.

In the recording, a female caller stated that a shooting had occurred near her home and that she saw four or five African-American men fighting in the street before the shooting. The caller said that she heard three shots, that she saw a man walk by her home, and that the man ran away. She stated that someone had been shot. When asked if the shooter was still at the scene, she responded, "No, they just disappeared. They got in the car maybe and r[a]n off." She said that although she did not see the victim, her daughter did. She identified the license plate number of a red Jeep that left the scene. She stated that she saw the Jeep stop in the road, that someone got out, and that another car parked in front of the Jeep. She said that she heard gunshots and that the Jeep backed into a driveway and drove away. She did not know whether the victim and the shooter arrived in the Jeep.

The female caller stated that she heard gunshots after a light-colored car parked in front of the Jeep. She did not know the make or model of the light-colored car but thought it might have been gold or tan. She did not know where the victim was located but said the Jeep drove down the hill, backed into her neighbor's driveway, and drove away. She said that the gunshots were not loud and that, based on the sounds, the gun might have been a .22-caliber. She said she heard three gunshots.

The female caller said that "four, five, six guys" were initially in the road, that one or two men walked by her house, and that the Jeep and the light-colored car arrived. She stated that she saw one of the Jeep's doors open, that she heard gunshots, and that the Jeep and the car drove in opposite directions. She said everyone "scattered."

The female caller stated that she saw a truck parked at the top of the hill and that she did not know why the truck was at the scene. She said that when her husband arrived home, he told her that African-American "kids" were fighting in the neighbor's yard. She stated that she walked to her door, that she saw four African-American men walking backward while looking at two other African-American men, and that she saw the Jeep arrive.

Anna Gouge testified that she arrived home at about 3:45 p.m. on the day of the incident. Ms. Gouge stated that she saw a four-door gray car park at the house across the street, that three men got out of the car, and that the men chased the victim and the victim's friend around her neighbor's house. Ms. Gouge said that the men fought in the backyard and that a repairman instructed them to stop fighting and to leave the property. Ms. Gouge stated that the victim walked backward up a hill, that the three men followed the victim, and that the victim's friend ran in the opposite direction. She said that she heard the victim say, "It wasn't me, I don't have it, I didn't do it." She stated that the victim and the three men were African-American and estimated that all the men were in

- 2 -

their twenties. Ms. Gouge stated that she heard the victim say, "It wasn't me, razor, it wasn't me." She said that two apartment complexes were located at the top of the hill and that she watched the victim and the three men walk toward the complexes and out of her view.

Ms. Gouge testified that a woman in a red Jeep drove by Ms. Gouge's home but that she did not see the Jeep's passenger. Ms. Gouge said that the Jeep stopped at "Ms. Jean's" house at the top of the hill and that Ms. Gouge heard one gunshot. She stated that she did not see anyone get out of the Jeep but that she heard the gunshot seconds after the Jeep parked. She said that after the gunshot, she saw someone run from the woods and enter the Jeep. She said that the Jeep backed down the hill, into her neighbor's driveway, and drove past her home. Ms. Gouge said that although her mother called 9-1-1, she provided the Jeep's license plate number to her mother.

Ms. Gouge testified that she walked up the hill and into the woods to check on the victim and that the victim lay on his side, "kind of curled." She did not recall seeing the gray car leave and said she did not see anyone run away. Sixteen photographs of the neighborhood were received as exhibits, and Ms. Gouge identified the neighborhood, the hill leading to the apartment complexes, an intersection at the top of the hill, the wooded area at the top of the hill, Ms. Jean's house, Ms. Gouge's driveway, and the backyard of the house across the street. Ms. Gouge stated that she saw a profile of the man she thought was the shooter, that the man was "husky," but that she could not identify him.

On cross-examination, Ms. Gouge testified that she thought the shooter got out of the gray car, not the red Jeep. She stated that the husky man who left the gray car weighed more than 175 pounds and that he wore a collared red-and-white-striped shirt. She could not recall whether the husky man wore blue jean pants or shorts. She stated that she spoke with defense counsel before the trial, that counsel showed her a photograph lineup, and that she chose a man from the lineup she thought could have been the shooter. She said that she was not confident in her choice and that the man she chose was most like the husky man she saw during the incident. Ms. Gouge said she did not see any of the men with a gun. She said that she saw the husky man run from the woods and enter the Jeep and that she did not see who shot the victim.

Diana Moore testified that she and her daughter saw a fight in the yard across the street at about 3:45 p.m. on the day of the shooting. Ms. Moore said that she walked to her door, that she "saw this little kid's head walking back and forth in front of my fence," and that "he was on the telephone and [I] didn't hear who or what or who he was talking to or anything." She said that she heard three gunshots and that the little boy ran away. She called 9-1-1.

Ms. Moore testified that she saw the victim walk backward up a hill, that two men followed the victim, and that the victim held his hands in the air. She stated that the victim and the men walked to the top of the hill and out of her view and that she heard three gunshots. She said that she did not hear a conversation between the victim and the men.

Ms. Moore testified that a light-colored car parked near Ms. Jean's house, that a person left the car, and that the person walked toward the wooded area at the top of the hill. She stated that a red Jeep, which was being driven by a woman, parked at the top of the hill, that an African-American man entered the Jeep, and that the Jeep backed into a neighbor's driveway and left the scene.

On cross-examination, Ms. Moore testified that she did not know the men fighting in her neighbor's yard and that the light-colored car arrived during the fight. Ms. Moore stated that a large African-American man left the car, that the man wore a white tank top, and that he walked to the top of the hill after the victim. She said that the large man who left the car was the same man who entered the red Jeep after the shooting. She did not see anyone leave the Jeep after it parked at the top of the hill.

On redirect examination, Ms. Moore testified, after reviewing her previous statement, that she saw a man leave the red Jeep, that the man followed the victim and the other men, that the men walked out of her view, and that she heard gunshots about one and one-half minutes later. Ms. Moore stated that the man returned to the Jeep and that the Jeep drove away. She said she could not identify the man who left the Jeep.

On recross-examination, Ms. Moore did not recall whether the man who left the red Jeep before the shooting was the same man who entered the Jeep after the shooting. She did not recall what the man who got out of the Jeep looked like or what type of clothes he wore.

Terry Price testified that he was carrying groceries from his car to his home on the day of the incident and that he saw men fighting across the street. Mr. Price stated that the victim walked backward up a nearby hill and that two men followed the victim. Mr. Price said that the victim's front pants pockets were inside-out and that the victim told the men that the victim only had five dollars and a razor. Mr. Price stated that the victim ran into the woods and out of his view. Mr. Price said that he heard one gunshot and ran toward the woods. He did not recall whether he saw any vehicles at the scene when the men followed the victim. Mr. Price said that, after he heard the gunshot, a light-colored car parked nearby, that the men got in the car, and that the car drove away.

- 4 -

Mr. Price testified that he ran up the hill and into the woods, that he saw the victim's body, that he called 9-1-1, and that he stayed with the victim until the police arrived. Mr. Price said that he could not identify any of the people he saw during the incident other than the victim and that all of the men were African-American.

On cross-examination, Mr. Price did not recall anyone leaving a silver car. Mr. Price was shown his police statement, and he testified that he did not recall the events detailed in the statement.

Mr. Price testified that he was interviewed at the police station on the day of the incident. He acknowledged that his memory on the day of the interview had been clearer than it was at the trial. He did not deny telling the police that he heard two gunshots but said he did not recall the number of gunshots. He did not recall seeing anyone with a gun during the incident. He acknowledged that he told the police he saw three men leave a silver car and two men leave a red Jeep but that he did not recall this at the time of the trial.

Jessica Foust testified that the victim was her boyfriend, that the victim never carried a gun, and that the victim smoked marijuana. Ms. Foust stated that she and Tabitha Gibbs were friends and that Ms. Gibbs and the Defendant were "together" at the time of the shooting. Ms. Foust said that she was with Ms. Gibbs and the Defendant on the day of the shooting, that the Defendant asked to use Ms. Foust's cell phone, and that the Defendant said he needed to speak with the victim. Ms. Foust stated that the Defendant asked Ms. Foust to drive him to the scene where the victim was located and that she drove her red Jeep "to where there was a lot commotion going on." Ms. Foust said that she saw men fighting the victim when she, the Defendant, and Ms. Gibbs arrived. Ms. Foust stated that the Defendant left the Jeep, that another man swung his fist at the victim, and that the victim fell on the ground. Ms. Foust said that the victim stood, jumped over a car, and ran into the woods.

Ms. Foust testified that the Defendant ran into the woods after the victim and that she heard three gunshots. Ms. Foust stated that the Defendant entered her Jeep and instructed her to drive away. Ms. Foust said that she drove the Defendant to "South Wood" apartments. Ms. Foust stated that he walked to the passenger-side door, that he told her and Ms. Gibbs that he loved them, and that he asked them not to tell anyone about the incident. Ms. Foust said that she did not see or speak to the Defendant again. Ms. Foust stated that she learned during her police interview that the victim had died.

Ms. Foust testified that the Defendant spoke to Jerrell Johnson on her cell phone as they left the apartment to drive to the scene and that the Defendant appeared

"agitated." She stated that Ms. Gibbs sat in the passenger seat and that the Defendant sat in the backseat. Ms. Foust said that her son was also in the car, that she drove to Mr. Johnson and Blakely Graves's home, that Ms. Foust heard a "commotion on the next road," and that Ms. Foust left her son with Mr. Johnson and Ms. Graves before driving to the scene.

Ms. Foust testified that the victim lived near the scene with "Wayne" and that the victim had been with Wayne on the day of the shooting. Ms. Foust stated that she spoke with the victim on Wayne's cell phone earlier in the day and that the victim did not indicate that he was in trouble. Ms. Foust said that, when she arrived at the scene, "Chico," Alan Hill, and Robert Caldwell were present. Ms. Foust stated that Brendon Ortiz[1] was known by the nickname "Chico," that Mr. Ortiz and Mr. Caldwell were Hispanic, and that neither man could have been mistaken as African-American. Ms. Foust said that Mr. Ortiz and Mr. Hill swung their fists at the victim and that the Defendant left the Jeep. Ms. Foust stated that the Defendant said to the victim, "Just fight my brother," that the Defendant appeared to be telling the victim to fight Mr. Ortiz, and that the victim would not fight.

Ms. Foust testified that she saw Mr. Hill knock the victim on the ground and that she "was trying to get them to stop." Ms. Foust said that the victim stood, "jumped" over a gray car parked in an intersection, and ran into the woods. Ms. Foust stated that Mr. Hill, Mr. Caldwell, Mr. Ortiz, and the Defendant followed the victim but that the Defendant "ran all the way into the woods with him." Ms. Foust said that the other men did not follow the victim and the Defendant into the woods and that she did not see what happened in the woods. Ms. Foust did not recall any other people or vehicles at the scene. She said that she knew Robert Reed but that Mr. Reed was not present during the shooting.

Ms. Foust testified that she did not see the Defendant enter the woods with a gun but that the Defendant had a gun when he returned to the Jeep. She said that she asked the Defendant whether he shot the victim and that the Defendant denied shooting the victim. She said that the Defendant appeared "agitated and nervous" as she drove him to the apartment. She stated that "we were all pretty upset" and that she and Ms. Gibbs cried because they had been scared and did not know what had happened. Ms. Foust said that before she drove away from the scene, she saw Mr. Caldwell, Mr. Hill, and Mr. Ortiz run from the woods.

---

[1] The spelling of his name appears in the record as "Ortiz" and "Orteze." A photograph of his driver's license was received as an exhibit and reflects "Ortiz" as the proper spelling.

Ms. Foust testified that Mr. Reed had been murdered sometime after July 7, that Mr. Reed and the victim were not "enemies," and that she did not hear anyone say Mr. Reed was involved in the victim's shooting. Ms. Foust stated that she did not see the Defendant with a gun when she drove to the scene and that he had a gun when he returned to the Jeep after the shooting. Ms. Foust said that she had seen the Defendant with a gun previously, most recently the day before the incident. Ms. Foust stated that the Defendant "provoked the fight" after he left the Jeep.

Ms. Foust testified that she drove to "Montgomery Village" after she dropped off the Defendant at South Wood, that Mr. Caldwell entered the Jeep when she drove to a stop sign, and that Mr. Caldwell drove because she was too emotional. She stated that police officers conducted a traffic stop and ordered her, Ms. Gibbs, and Mr. Caldwell out of the Jeep. Ms. Foust said that she was placed in a patrol car and that the officers periodically removed her from the car in order for witnesses to identify her as the driver of the Jeep.

Ms. Foust testified that she was taken to the police station and that she did not know the victim was dead. She said that she was interviewed by the police and that she was afraid of the Defendant and of being in trouble with the police. Ms. Foust said that she was charged with being an accessory after the fact but that her case was dismissed after two years in exchange for her truthful testimony at the trial.

Ms. Foust testified that she later learned why the shooting occurred. Ms. Foust stated she knew Martel Dunn, that Mr. Dunn and the victim were friends, and that Mr. Dunn's nickname was "Pooh." She said that she saw Mr. Dunn walk away from the scene as she drove toward it. She said that Mr. Ortiz, Mr. Caldwell, and Mr. Hill were shouting at the victim when she arrived and that the Defendant used an angry tone when he spoke to the victim and told the victim to fight.

On cross-examination, Ms. Foust testified that she could not recall what the Defendant wore on the day of the incident. She stated that she spoke with the police on the day of the shooting and again on July 5. She said that she was familiar with the Defendant's carrying a gun and that the Defendant typically carried the gun on "his side." She stated that she generally knew whether the Defendant had a gun based on the way the Defendant walked but that sometimes she was unable to determine whether he had a gun depending on his clothes. Ms. Foust acknowledged telling the police during her second interview that because her son was inside the Jeep, she ensured the Defendant did not have a gun before he entered the Jeep. Ms. Foust stated that she was asked multiple times by the police whether the Defendant had a gun on the way to the scene and that she told the police the Defendant did not have a gun. She said that she looked to determine if

the Defendant had a gun before he entered her Jeep and that he did not have a gun. She said that the victim tried to remove something from his pocket during the incident and that she heard the Defendant say to the victim, "[A]re you carrying a f------ gun, dude? You got a gun on you? What are you reaching for?"

Ms. Foust testified that she did not see what happened when the Defendant and the victim were in the woods and that she did not see who shot the victim. She said she had never previously seen the victim with a gun. She said that the Defendant denied shooting the victim and that she stood outside of her Jeep when she heard the gunshots.

On redirect examination, Ms. Foust testified that she was not forthcoming initially with the police and that she went to the police station for a second interview after she learned of the victim's death. She stated that she did not intend to imply that the victim "was pulling a gun" from his pocket and that the victim tried to show he did not have anything in his pockets.

Jerry Miller testified that he drove by the scene at about 3:45 p.m., that about eight to ten people stood in the road, that two men ran in front of his car, and that the men appeared to be fighting. Mr. Miller said that the two men ran into the woods and that he heard three gunshots. Mr. Miller called 9-1-1.

On cross-examination, Mr. Miller testified that he thought he called before hearing the gunshots. A recording of the 9-1-1 call was played for the jury. In the recording, Mr. Miller stated that he heard at least three gunshots and that four men chased another man into the woods. Mr. Miller said a woman had stated that a man had been shot in the back of the head. The 9-1-1 operator transferred Mr. Miller's call "to the ambulance." Mr. Miller estimated that the victim was age eighteen and that the other men were probably teenagers. Mr. Miller said that the African-American men wore loose-fitting shorts. Mr. Miller stated that he walked into the woods and that the victim was not moving.

Mr. Miller testified that his attention was drawn to one man and to the victim, who were fighting, that the man swung his fist at the victim, and that the victim "ducked" and ran. Mr. Miller said that he saw the man reach into his pocket and that the man wore light-colored shorts. Mr. Miller stated that he did not know what the man reached for and that he could not identify the man. On redirect examination, Mr. Miller stated that two or three days after the shooting he told officers he saw one man chase the victim into the woods.

Knoxville Police Investigator Timothy Riddle testified that he saw the deceased victim lying in the woods when he arrived at the scene. Investigator Riddle said that he

and other investigators spoke to approximately fifteen or sixteen people about the incident and that one witness identified a license plate number belonging to a red Jeep. He said officers stopped the Jeep about twenty minutes after the shooting.

Investigator Riddle testified that a show-up identification was conducted to identify the Jeep's passengers. He stated that Ms. Foust, Ms. Gibbs, and Mr. Caldwell were taken to the police station and were interviewed. Investigator Riddle said that, based upon information provided by Ms. Foust, he determined he needed to speak with the Defendant. Investigator Riddle said the Defendant was a member of the Black Crime Family (BCF), which was a "rapping" organization that mentored "the youth." Investigator Riddle said that he attempted to identify BCF members in an effort to find the Defendant. Investigator Riddle said Ms. Foust, Ms. Gibbs, Mr. Ortiz, Mr. Caldwell, Mr. Hill, Mr. Reed, James Dean, and the Defendant were BCF members.

Investigator Riddle testified that Mr. Ortiz never came to the police station for an interview, although Mr. Ortiz told an officer he would provide a statement. Investigator Riddle stated that he learned Mr. Ortiz drove a silver car and that he stopped the silver car driven by Mr. Ortiz on the day of the shooting. Investigator Riddle said that Mr. Ortiz was taken to the police station for an interview and that the Defendant became a suspect afterward. Investigator Riddle said that he interviewed Mr. Caldwell twice and that he learned additional information about the Defendant based upon these interviews.

Investigator Riddle testified that he called a telephone number he thought belonged to the Defendant and that he asked BCF members to request the Defendant come to the police station for an interview. Investigator Riddle stated that he contacted the U.S. Marshal Service to conduct an emergency "phone ping" of the Defendant's cell phone and that he thought the Defendant no longer used the phone after the shooting. Investigator Riddle said the Defendant was arrested in Chattanooga on July 18, 2012.

Investigator Riddle testified that he read the Defendant his *Miranda* rights and that the Defendant agreed to speak with him. Investigator Riddle said that the Defendant denied being in Knoxville on the day of the shooting and said he did not own a cell phone. Investigator Riddle said he told the Defendant that the Defendant's cell phone number appeared in Mr. Caldwell's and Mr. Ortiz's cell phone records in the days following the shooting. Investigator Riddle stated that the Defendant initially appeared "dumbfounded" as to why he was at the police station. Investigator Riddle said that the Defendant did not appear intoxicated and was well-spoken and intelligent. Investigator Riddle stated that the Defendant did not appear frightened or nervous and that the Defendant was cooperative. Investigator Riddle said that the Defendant's statement was video recorded. The video recording was played for the jury.

In the recording, the Defendant stated that he was at a skating party in Chattanooga and that U.S. Marshals arrested him in a parking lot. Investigator Riddle read the Defendant his *Miranda* rights, and the Defendant signed a waiver of rights form. The Defendant stated that he went to Chattanooga on June 28, 2012, and that he appeared in court on June 29. The Defendant said that he had been in Knoxville periodically because he was trying to move his record label to Chattanooga. The Defendant stated that his charges in Chattanooga were for traffic tickets. The Defendant stated that he usually stayed at a house in East Knoxville when he was in Knoxville. The Defendant said that he was in Chattanooga on July 3, that he stayed with his aunt, and that he and his family had a cookout on July 4.

Investigator Riddle stated that the Defendant had been indicted for the first degree murder of the victim. The Defendant said that he did not know the victim, that he knew Mr. Ortiz as "Chico," that he knew Mr. Caldwell, and that he did not know Mr. Reed or anyone known as "J.R."[2] The Defendant stated that he did not know Mr. Hill or anyone known as "Big Al." The Defendant said that he only associated with "Bmore" and the Defendant's brother in Knoxville. The Defendant said that he owned a mobile recording studio and that his brother stored the recording equipment. The Defendant stated that he knew Ms. Gibbs and that he and Ms. Gibbs had "talked."

Investigator Riddle stated that the victim was shot in the head after an altercation occurred between the victim, Mr. Ortiz, Mr. Hill, and Mr. Caldwell. Investigator Riddle said that he was told Mr. Reed and Mr. Dunn, who was known as "Pooh," were also at the scene. Investigator Riddle stated that he knew the Defendant came to the scene in a red Jeep with Ms. Gibbs and Ms. Foust. The Defendant denied knowing about the victim's death. The Defendant acknowledged that he was a BCF member. Investigator Riddle stated that the victim had stolen marijuana from Mr. Ortiz, that BCF members had said the Defendant was at the scene, and that witnesses had identified the Defendant as the man who chased the victim into the woods. The Defendant said he was not involved.

Investigator Riddle told the Defendant that cell phone records proved the Defendant was in Knoxville on the day of the shooting. The Defendant said that the cell phone number to which Investigator Riddle referred did not belong to him.

The Defendant, however, admitted that he saw a fight when he arrived at the scene in the Jeep with Ms. Foust and Ms. Gibbs, that they left the scene in the Jeep, and that he did not know why the fight started. The Defendant said that he saw about twelve or fifteen men in the street fighting and that he only recognized Mr. Ortiz. The Defendant

---

[2] The record reflects that Mr. Reed's nickname was J.R.

stated that he did not leave the Jeep or participate in the fight. The Defendant said that he went to the scene with Ms. Foust and Ms. Gibbs because he did not want them to go alone, that Ms. Gibbs received a telephone call about the fight, and that Ms. Foust and Ms. Gibbs wanted to see the fight because "they love to see attention and drama."

Investigator Riddle stated that the first 9-1-1 telephone call was placed at 3:46 p.m., that the Defendant spoke by telephone with Mr. Ortiz at 3:32 p.m., and that the Defendant spoke with Mr. Ortiz again at 3:36 p.m. The Defendant said that he and Mr. Ortiz did not have a conversation, that he heard only background noises and voices, and that "it sounded like a brawl." The Defendant stated that neither Ms. Foust nor Ms. Gibbs left the Jeep.

The Defendant stated that he went to "check on his brother" after the incident, that Ms. Foust and Ms. Gibbs drove to Montgomery Village, and that he got out of the Jeep and walked to Montgomery Village. Investigator Riddle told the Defendant that Ms. Foust and Ms. Gibbs said they dropped off the Defendant at an apartment complex in South Wood. The Defendant denied being in South Wood and said he did not own a gun. The Defendant stated that he went to eat with "Keith" in West Knoxville after he left his brother's apartment and that he did not know Keith's last name. The Defendant did not recall hearing gunshots at the scene.

The Defendant stated that he and Keith "drove around" and smoked marijuana after dinner. The Defendant said that he met Keith through a mutual friend, who sold the Defendant marijuana. The Defendant stated that he did not know what type of car Keith drove and that he had known Keith about two or three months before the shooting. The Defendant said that he took a taxi to meet Keith and that Keith did not own the car he drove to the restaurant.

The Defendant stated that he owned a Monte Carlo and an El Camino and that the El Camino was inoperable and was parked at his brother's apartment. Investigator Riddle asked the Defendant whether he knew the El Camino was "fire bombed," and the Defendant responded, "Are you serious?" The Defendant denied knowing his El Camino had been set on fire. The Defendant stated that he paid "Michael" to drive him to Chattanooga about one week before the interview.

Investigator Riddle left the interview room, and the Defendant knocked on the door a few minutes later. Investigator Riddle returned to the room, and the Defendant stated that he "was at the fight, [he] made some calls from [his] phone, [he] was with his girl, . . . and [he] did go to South [W]ood." The Defendant said that he went to Chattanooga after he learned his El Camino had been fire bombed because he thought

- 11 -

somebody was trying to kill him. The Defendant stated that he went to South Wood after the incident to gather his thoughts and that he did not see or hear anything related to the shooting. The Defendant said that he saw people in the street swinging and punching each other and that everyone ran away.

When asked, "[W]ho told you about [Mr. Reed's] getting killed," the Defendant responded, "What?" Investigator Riddle stated that Mr. Reed was fatally shot in the head on July 6 or 7. The Defendant said that he knew Mr. Reed by "J.R." and that he did not know Mr. Reed was dead. The Defendant stated that he did not know who shot Mr. Reed and that he left Knoxville after his El Camino was fire bombed because he "felt like somebody was after [him]." Investigator Riddle stated that witnesses at the scene said they saw an African-American man leave the Jeep, run into the woods, and return to the Jeep before it drove away. The Defendant stated that he never got out of the Jeep.

An officer identified as Sergeant Hejna entered the interview room. He and Investigator Riddle repeatedly asked the Defendant what happened in the woods and stated that they wanted to give the Defendant the opportunity to tell the truth. The following exchange occurred between Investigator Riddle and the Defendant:

> INVESITGATOR RIDDLE: . . . I don't think you were intending on hurting anybody. You might have went [sic] there to partake in a fight because you are somewhat the leader of your organization of your rap group. You're a rap label which is somewhat BCF related. Your boy, [Mr. Ortiz], was in a fight. They consider you the big homie. You have to be there. You have to be there to supervise this org . . . this situation okay? Did . . . did [the victim] have a gun? If he had a gun, I would . . . I could say, "look, prosecutor . . . ."
>
> DEFENDANT: Let's cut all that s---, man.
> INVESTIGATOR RIDDLE: . . . "[the victim], had a gun." Did it go down that way? Did y'all fight and you had to defend yourself? I can see . . . I can understand that. There is a defense theory here . . .

The Defendant stated that the victim reached for a gun in the victim's pants and that the victim dropped the gun. When asked, "Did you pick up the gun and 'pop' him," the Defendant responded, "I feared for my life." The Defendant said that he threw the gun "as far as I could man." The Defendant stated that he typically calmed situations, that he never "did this type of" thing, and that the situation "just went bad." The Defendant said that he had been unable to sleep or eat since the incident. The Defendant stated that he threw the gun out of the window as he rode in the Jeep after the shooting.

- 12 -

The Defendant testified that he fought the victim, that the victim ran, that he chased the victim, and that the victim dropped the victim's gun on the ground. The Defendant stated that he and the victim both reached for the gun, that he grabbed the gun, and that the victim "takes off." The Defendant said that the victim "was like running and I just kind of turned away," that he thought he shot once, and that he might have shot more than once but could not recall. The Defendant stated that "everybody [the police] named" was at the scene and that he and the other BCF members chased the victim into the woods. The Defendant said that he later learned the victim had stolen something and that the victim and his "crew" were known for theft in the neighborhood.

The Defendant stated that he picked up the gun from the ground after the victim dropped it, that he did not know whether the gun was loaded, and that he "let one go and [he] ran." The Defendant said that the victim dropped the gun, that he and the victim reached for the gun, and that the victim realized the Defendant was closer to the gun. The Defendant stated that he grabbed the gun and that he "just like kind of backed up and boom." The Defendant said that both he and the victim were standing when he fired the gun. The Defendant stated that he was turned and running when he shot the gun. The Defendant said that did not know how many shots he fired and that he "fired and ran like in . . . almost in the same [] motion."

The Defendant testified that he entered the Jeep with the gun, that Ms. Foust said that the Defendant "probably" scared the victim, and that the Defendant told Ms. Foust he was scared. The Defendant stated that everyone ran and that Ms. Foust drove away. The Defendant said that he left the Jeep at South Wood.

The Defendant stated he learned his El Camino had been fire bombed the next day and that he thought someone was "out to get [him]." The Defendant said that he "didn't bring this intentionally" and that he would change the "situation" if he were able. The Defendant stated he had not known Mr. Reed was dead before the interview. The Defendant said that he went to the scene to deescalate the altercation, that he intended to fight the victim "one-on-one," and that the situation changed when he saw the victim reach for a gun in the victim's pants pocket. The Defendant said that he thought he threw the gun into a wooded area as the Jeep drove on Baker Street.

Investigator Riddle identified photographs depicting the crime scene, including the victim's body lying face down and covered by a blanket. Investigator Riddle identified photographs of the victim lying on his back with a toothbrush sticking out of his right front pocket.

Investigator Riddle testified that he received information after the incident that Mr. Ortiz was driving a silver car, that he saw Mr. Ortiz driving a silver Acura, and that he arrested Mr. Ortiz following a traffic stop. Photographs of Mr. Ortiz's car, driver's license, and tattoos were received as exhibits.

Investigator Riddle testified that he interviewed Jean Parrott about the incident and that Ms. Parrott had since died. Investigator Riddle stated that Mr. Dunn initially gave a statement in which Mr. Dunn reported seeing the fight and running from the scene. Investigator Riddle said that he interviewed Mr. Dunn a second time and that "[his] gut feeling, told [him] that [Mr. Dunn] could have potentially set this young man up and that he was part of this crime." Investigator Riddle stated that Mr. Dunn said during his second interview that Mr. Reed was present during the incident and that Mr. Reed, Mr. Hill, and "two Chico[]s" arrived at the scene in a silver car. Investigator Riddle said that Mr. Dunn was the only person who indicated Mr. Reed was present. Investigator Riddle stated that Mr. Reed's body was found on July 9, after he had been missing since July 7.

Investigator Riddle testified that he received a telephone call about a car being on fire at 4:30 a.m. on July 4. Investigator Riddle stated that he went to the scene and that he saw the Defendant's El Camino on fire. Investigator Riddle said that the El Camino was taken to the police department and investigated. Investigator Riddle said that none of the witnesses said the victim had a gun. When asked "why did you ask [the Defendant] if [the victim] had a gun," Investigator Riddle responded, "Because he was lying to me – I knew he was lying to me and I wanted to give him that out, and he continued to lie to me."

Investigator Riddle testified that telephone records reflected the Defendant spoke with Mr. Ortiz and Mr. Caldwell in the minutes before and after the shooting. Investigator Riddle stated that the Defendant also communicated with Mr. Dean after the shooting and that Mr. Dean's nickname was "Baltimore." Investigator Riddle said that two or three text messages were exchanged between the Defendant and Mr. Caldwell. Investigator Riddle stated that the Defendant's statement was inconsistent with the records and that the Defendant made several statements, which he later admitted were false.

Investigator Riddle testified that Mr. Dunn received two telephone calls from Mr. Ortiz on the day of the incident but before the shooting. Investigator Riddle stated that the Defendant never said that he had received threats during his interview. Investigator Riddle said the gun used in the shooting was never recovered.

On cross-examination, Investigator Riddle testified that he interviewed several witnesses at the scene and that none of the witnesses saw the shooting. He stated that two or three witnesses reported seeing a "stocky" man with a gun enter a red Jeep after hearing gunshots. Investigator Riddle estimated that the Defendant weighed about 165 pounds when the incident occurred. Investigator Riddle stated that none of the witnesses at the scene identified the Defendant as the shooter and that only Ms. Foust and Ms. Gibbs selected the Defendant from a photograph lineup.

Investigator Riddle testified that Mr. Dunn was the victim's "associate" and was with the victim before the shooting. Investigator Riddle said that he interviewed Mr. Dunn twice and that Mr. Dunn said Mr. Reed was present at the scene during the second interview. Investigator Riddle said that he requested a second interview with Mr. Dunn because he felt Mr. Dunn withheld information during his first interview. The video recording of Mr. Dunn's second interview was played for the jury.

In the recording, Investigator Riddle, who was with an unidentified officer, read Mr. Dunn his *Miranda* rights. Investigator Riddle stated that he knew Mr. Dunn was not honest during his first interview and that he knew Mr. Dunn did not disclose important details about the shooting. Investigator Riddle told Mr. Dunn that he knew Mr. Dunn was present during the incident. Mr. Dunn stated that he became friends with the victim and Wayne, that he did not know all of the men involved in the incident, and that he knew some names. Mr. Dunn stated that he did not see the Defendant at the scene.

Mr. Dunn stated that Mr. Reed, Mr. Hill, and "both of the Chicos" arrived in a silver car and that he did not know who owned the car. Mr. Dunn said that the men jumped out of the car and that both of the Chicos had a lighter skin tone. Mr. Dunn said that he did not see Ms. Foust's "purple truck" arrive at the scene and that "they said [the Defendant] was in the truck with [Ms. Foust]." Mr. Dunn stated that he did not see the truck drive by him but that he saw Ms. Foust get out of the truck. Mr. Dunn said that he knew the Defendant, that a friend later told him the Defendant was in the truck, but that he did not see the Defendant.

Mr. Dunn stated that he was home with the victim playing video games on the day of the shooting, that "Chico" called his cell phone, and that Chico asked to speak with the victim. Mr. Dunn said that the victim and Chico ended the call and that Chico called a second time to speak with the victim. Mr. Dunn stated that the victim did not appear scared and that the victim placed the caller on speaker phone. Mr. Dunn said that Chico asked where the victim was located, that the victim lied and said the victim was at Wayne's house, and that Mr. Dunn knew "something was going on." Mr. Dunn stated that Chico asked if Chico could meet the victim and that Mr. Dunn knew a fight would

- 15 -

occur. Mr. Dunn said that Chico sounded "suspicious" during the call and that Mr. Dunn went with the victim to meet Chico.

Mr. Dunn stated that he and the victim were walking down a street when a silver car arrived. Mr. Dunn said that the men jumped out and cornered him and the victim. Mr. Dunn said that Mr. Reed and Mr. Hill got out of one side of the car and the "Chicos" got out of the other side. Mr. Dunn stated that the victim was capable of fighting both Chicos but that the victim did not try to fight. Mr. Dunn said that the victim would have run away had the victim known the men would hurt or kill him. Mr. Dunn stated that the victim walked backward while facing the men, that he saw the victim "go through his pockets," and that the victim stated he did not have anything belonging to the men. Mr. Dunn said that he asked Mr. Reed "what's going on" and that Mr. Reed said the altercation was about money. Mr. Dunn stated that Mr. Hill tried to swing at Mr. Dunn and that the victim and the Chicos walked around a nearby house. Mr. Dunn stated that Mr. Hill started to run toward the victim and the Chicos and that Mr. Dunn ran after Mr. Hill. Mr. Dunn said that he saw the victim reappear and that a truck was parked at the scene. Mr. Dunn stated that he called "Chicago" for help. Mr. Dunn said that he did not recall the truck's driving past him, that he was separated from the victim, and that he stayed at the scene until he heard gunshots. Mr. Dunn stated that Chico drove the silver car. Mr. Dunn was unable to identify the second Chico from a photograph lineup.

Investigator Riddle testified that Mr. Dunn was the first person who said Mr. Reed was present during the incident. Investigator Riddle stated that none of the witnesses, including Ms. Foust and Ms. Gibbs, said they saw the Defendant with a gun before the shooting. Investigator Riddle said that Mr. Reed was found dead a few days after the incident and that he had been shot in the back of the head. Investigator Riddle stated that the Defendant's El Camino was fire bombed before Mr. Reed was killed and that he assumed the fire was in retaliation for the victim's death. Investigator Riddle said that the Defendant initially said he knew everyone at the scene except the victim and Mr. Reed. Investigator Riddle acknowledged that a person might lie to law enforcement to protect someone else.

On redirect examination, Investigator Riddle testified that he determined a man of "medium to skinny" build was the person who entered the red Jeep with a gun after the shooting and that the general description matched the Defendant. Investigator Riddle stated that nobody identified the Defendant in a photograph lineup but that, in his opinion, the Defendant was "definitely the one that got out of the car, he's definitely the one that went into those woods, and he's definitely the one that got back in that car with a gun."

- 16 -

Dr. Steven Cogswell, an expert in forensic pathology, conducted the victim's autopsy and testified that the nineteen-year-old victim received a gunshot wound to the back of the head. Dr. Cogswell said that the victim suffered a skull fracture near the top of his head from the bullet and that the bullet stopped under the victim's scalp. Dr. Cogswell stated that the victim had impact abrasions in the center of his forehead, near his nose, and on his chin and that the abrasions occurred from the victim's falling on the ground. Dr. Cogswell said that the victim's hands were not injured and did not appear to have been in an altercation before the shooting.

Dr. Cogswell testified that the victim had his back turned to the shooter when he was shot. Dr. Cogswell stated that the victim received an "undetermined range gunshot wound," which would have been "past where the gunpowder stippling would occur and that's generally speaking about three feet, depending on the type of gunpowder." Dr. Cogswell said that the victim's wound was consistent with the victim's running from the shooter when he was shot. Dr. Cogswell stated that the victim's manner of death was homicide.

On cross-examination, Dr. Cogswell testified that the victim received one gunshot wound and that he saw one entrance wound and recovered one bullet from the victim's skull. Dr. Cogswell stated that the bullet entered the back of the victim's head "with a slightly upward trajectory" and that he was unable to determine definitively the distance between the gun and the victim when the victim was shot but that the victim was at least three feet from the gun. Dr. Cogswell said that he could not determine whether the victim was standing, running, or bent over when he was shot but that he was not sitting or lying down.

Tabitha Gibbs testified that she and the Defendant had a romantic relationship in July 2012 and that she and the Defendant were together before the shooting. She stated that the Defendant received a telephone call and that she, Ms. Foust, and the Defendant left her home in Ms. Foust's Jeep. Ms. Gibbs said that when they arrived at the scene, she saw Mr. Hill, Mr. Ortiz, and Mr. Caldwell fighting the victim. Ms. Gibbs stated that she did not leave the Jeep, that the Defendant left the Jeep, and that the Defendant followed the victim. Ms. Gibbs said that the men moved out of her view and that she heard two gunshots. Ms. Gibbs stated that the Defendant returned to the Jeep, that he sat in the backseat, and that she, Ms. Foust, and the Defendant left the scene.

Ms. Gibbs testified that she was scared and that the Defendant told Ms. Foust to drop him off at South Wood. Ms. Gibbs stated that the Defendant smoked a cigarette but did not say anything in the car after the incident. Ms. Gibbs said that she did not see the Defendant with a gun after the incident and that she did not see him throw a gun out of

the Jeep's window. Ms. Gibbs stated that after the Defendant got out of the Jeep, Ms. Foust drove to Montgomery Village and that Mr. Caldwell entered the Jeep. Ms. Gibbs said that the police conducted a traffic stop and that she was taken to the police department for an interview.

Ms. Gibbs testified that the Defendant said he needed to go to the scene because the victim had stolen marijuana from him and that the Defendant appeared "eager." Ms. Gibbs stated that the Defendant seemed "blank" after the shooting and that she never spoke with or saw the Defendant after the day of the shooting. Ms. Gibbs said that she did not know the victim very well and that she never saw the victim with a gun.

On cross-examination, Ms. Gibbs testified that the Defendant wore a navy shirt and blue cargo shorts on the day of the incident. Ms. Gibbs stated that she did not see the Defendant with a gun when they left the apartment and that the fight had already started when they arrived at the scene. Ms. Gibbs said that she did not see the Defendant with a gun when he got out of the Jeep and that she saw everyone involved in the fight run toward the woods. Ms. Gibbs stated that she had seen the victim about twenty times before the shooting.

Portions from three recorded jail telephone calls were played for the jury. The first call occurred on July 20, 2012, between the Defendant and an unidentified woman. The Defendant stated that he was in maximum security and was allowed outside of his jail cell one hour per day. The Defendant said that he did not mind being in maximum security because it gave him time to think. The Defendant asked the woman to place money on his "account" for stamps. The Defendant stated that he was attempting to hire an attorney because during the incident he felt "like it was either me or [the victim]" and that the victim was going to shoot him. The Defendant said that the victim dropped the gun, that he and the victim reached for the gun, and that he picked up the gun first. The Defendant stated that he needed an attorney because "it's really manslaughter, that s---[isn't] first degree." The Defendant said that he left Knoxville after the incident because someone set his car on fire, killed his friend, "shot up" the place he was staying, and "hit" his apartment. The Defendant stated that he did not shoot anyone intentionally and that the victim had a gun. The Defendant said that he hoped he would receive five or six years' incarceration at 30% service. The Defendant stated that "this is [his] first time around," that he was not concerned, and that he wanted to go home to get his life together.

In the recording of a July 21, 2012 jail call, the Defendant spoke with the same unidentified woman and stated that he needed an attorney to assist him in receiving a "lesser charge." The Defendant said that "if anything it will be manslaughter" because

the victim "drew" a gun on him. The Defendant stated that it was a bad situation, that the victim dropped the gun, and that the Defendant reached for the gun on the ground. The Defendant said that his El Camino was set on fire, that his friend had been shot, and that the person tried to "get at [him] like four or five times," which was why he left Knoxville. The Defendant stated that he felt his life was in danger, that he was upset about the incident, and that he "had to do what he had to do."

In the recording of a July 28, 2012 jail call, the Defendant spoke with an unidentified man. The Defendant stated that he had court on Friday and that someone had tried "to knock [him] off but he dropped his tool." The Defendant said that four attempts had been made to "knock [him] off" and that he tried to hire an attorney. The Defendant stated that his Monte Carlo was in an automobile shop and that he needed the man to keep the car safe until he was no longer incarcerated. The Defendant said that he was not "doing anything crazy" and that someone was "trying to get at [him]."

Patricia Snavely testified for the defense that she was driving to work on the day of the shooting, that she stopped at a stop sign, and that she saw a burgundy SUV to her right. Ms. Snavely stated that she waited for the SUV to pass, that the female driver did not move the SUV, and that the driver appeared "shocked." Ms. Snavely said that she looked to her left and saw a group of men fighting near the road.

Ms. Snavely testified that she saw one tall man, one "average" man, and "some kids" chasing the victim. Ms. Snavely said that the victim ran by her truck, that she thought the victim was going to jump in the bed of her truck, and that "the older" man "started telling the younger little boys – where to go[.]" Ms. Snavely stated that the victim pointed at his pants pocket, that he stood beside her truck for a few seconds, and that the he ran into a wooded area. Ms. Snavely said that the older man chased the victim into the woods. Ms. Snavely stated that she got out of her truck, that she asked the woman driving the SUV what was happening, and that the woman appeared to be stunned. Ms. Snavely said that she heard two gunshots, that the older man walked from behind a tree, and that the man held a gun in his hand.

Ms. Snavely testified that the older man who held the gun wore dark blue "basketball shorts" and a white shirt. Ms. Snavely stated that the man had a very dark complexion and had a "chiseled" and "squared" jaw line. Ms. Snavely said that she saw the man place the gun in his pocket, run to a Jeep, and get inside. Ms. Snavely stated that the Jeep turned and drove away. When asked whether the Defendant was the man she saw with the gun, Ms. Snavely replied, "No." Ms. Snavely said that she saw the man with the gun very clearly and that "there's no doubt, that's not him." Ms. Snavely stated

- 19 -

that officers showed her a photograph lineup and that she was unable to identify anyone from the lineup.

On cross-examination, Ms. Snavely testified that she saw only one man chase the victim into the woods and that she heard two gunshots. Ms. Snavely stated that she met with trial counsel before the trial, that counsel showed her a photograph lineup, and that none of the men in the lineup was the person she saw with the gun. Ms. Snavely said that the man was about three and one-half or four feet away from her when she sat in her truck at the stop sign and was about twenty feet away when she saw him emerge from the woods with the gun.

James Dean testified that he and the Defendant recorded rap music together and that Mr. Dean's nickname was "Baltimore." Mr. Dean stated that he was friends with Mr. Reed and that Mr. Reed had been killed. Mr. Dean said that he knew the victim from "around the neighborhood." Mr. Dean stated that he was not involved in the victim's shooting and that he was not present at the scene.

Mr. Dean testified that Mr. Reed called him on the morning of the shooting, that Mr. Reed was looking for the victim because the victim had stolen money, and that Mr. Reed seemed angry. Mr. Dean said that Mr. Reed called him again a few hours later and that Mr. Reed said he did not intend to shoot the victim. Mr. Dean stated that Mr. Reed said he was going to Mississippi so he would not have to face the consequences of killing the victim.

Mr. Dean testified that he was interviewed by police officers after the incident and that he did not tell the officers about his telephone conversations with Mr. Reed. Mr. Dean stated that Mr. Reed had just been killed when he was interviewed, that he was upset about Mr. Reed's death, and that he "didn't want to throw dirt on [Mr. Reed's] name at the time."

On cross-examination, Mr. Dean testified that he was a member of the BCF record label. He acknowledged that he never told the police Mr. Reed was a BCF member and insisted that he was interviewed after Mr. Reed had been killed. Mr. Dean said that he attempted to speak with the victim's mother and sister about his conversations with Mr. Reed but that "people kept telling [him] not right now, it's not the right time." Mr. Dean agreed that the trial was the first time he had told anyone about his conversations with Mr. Reed. Mr. Dean denied he had been paid for his testimony and said that he did not want the Defendant to go to jail for a crime the Defendant did not commit. Mr. Dean said that "the streets" knew who killed the victim and that this was the reason Mr. Reed was killed.

The Defendant testified that he did not know the victim and that he spent the night before the incident with Ms. Gibbs at her and her roommate's apartment. The Defendant stated that Ms. Foust came to visit Ms. Gibbs on the day of the shooting. He said that he received a telephone call from Mr. Caldwell, that Mr. Caldwell said Mr. Ortiz was going to fight the victim, and that he was friends with Mr. Ortiz. The Defendant said that he mentioned the victim's name to Ms. Gibbs and Ms. Foust after the telephone call ended, that Ms. Foust asked if he were referring to her boyfriend, and that he said he was unsure. The Defendant said that Ms. Foust called a friend and that the Defendant tried to call Mr. Ortiz several times but was unable to speak with Mr. Ortiz.

The Defendant testified that he, Ms. Gibbs, Ms. Foust and Ms. Foust's son left the apartment in Ms. Foust's Jeep. The Defendant stated that he told Ms. Foust he did not have a gun. He said that Ms. Foust drove to her friend's house in Montgomery Village to drop off her son. The Defendant stated that Ms. Foust and Ms. Gibbs walked Ms. Foust's son to the door and that he stood outside of the Jeep. He said that he heard horns and screaming one street over and that he, Ms. Foust, and Ms. Gibbs returned to the Jeep.

The Defendant testified that Ms. Foust drove to the scene, that he saw cars and people in the street, that men were fighting in the street, and that he saw Mr. Ortiz fighting the victim. The Defendant said that he got out of the Jeep, that he ran toward the fight, and that it appeared everyone he knew was trying to fight the victim. He stated that he told the group not to "jump" the victim and to let Mr. Ortiz and the victim fight.

The Defendant testified that he separated the victim and Mr. Ortiz, that he asked Mr. Ortiz why he was fighting the victim, and that the victim hit the Defendant. The Defendant stated that he swung his fist at the victim and that everyone resumed fighting. He recalled that Mr. Caldwell swung his fist at the victim and that the victim stepped away. The Defendant said that the victim repeatedly reached into his waistband or pocket and that the Defendant felt he was in danger because he was unarmed. The Defendant stated that he asked the victim whether the victim had a gun and if the victim was going to shoot him. The Defendant said that he "rushed" the victim to keep the victim from removing anything from his pocket or waistband.

The Defendant testified that the victim removed a gun from the victim's pants pocket or waistband and dropped it on the ground. The Defendant said the gun fell on the ground between him and the victim. The Defendant said that he ran toward the gun and placed his body between the gun and the victim. The Defendant stated that the victim reached around the Defendant's body and grabbed the Defendant's arm. The Defendant said that he fired a single gunshot at the ground because the victim was trying to obtain possession of the gun. The Defendant stated that he ran from the victim after he fired the

- 21 -

gunshot and that he heard two additional gunshots as he ran. The Defendant said that he did not know who fired the two gunshots at the time and that he thought someone was shooting at him.

The Defendant testified that he ran through "a brush pile" and trees to the street, that he ran to the Jeep, that Ms. Foust stood outside of the Jeep, and that Ms. Gibbs sat in the passenger seat. The Defendant stated that he and Ms. Foust got in the Jeep, that Ms. Foust backed the Jeep into a mailbox or tree, and that Ms. Foust drove away. The Defendant said that Ms. Foust asked whether he shot someone and that he told her he did not. The Defendant stated that he felt physically ill and that he could not calm himself. The Defendant stated that Ms. Foust said she was going to drive to her mother's house and that the Defendant asked Ms. Foust to stop at an apartment in South Wood. The Defendant said he left the Jeep and that he told Ms. Gibbs to call him later. The Defendant said that he called Mr. Ortiz seven or eight times before speaking with Mr. Ortiz and that Mr. Ortiz said the victim was dead. The Defendant said that he threw the gun into a nearby wooded area to release anger and frustration.

The Defendant testified that later in the evening he "was getting wind that people were trying to – kill me if I stayed around." The Defendant stated that his car was fire bombed the next day and that he went to Chattanooga. The Defendant said that he went to court in Chattanooga for speeding and misdemeanor possession and that he would not have gone to court if he were hiding from the police. The Defendant said that he denied knowing Mr. Reed during his police interview because he was protecting Mr. Reed. The Defendant stated that he did not tell the police the entire truth but that he did tell the officer about the victim's dropping the victim's gun on the ground. The Defendant stated that he did not intend to hurt or to kill the victim when he left Ms. Gibbs's apartment, that he did not have a gun when he left the apartment, and that he did not intend to kill anyone when he reached for the victim's gun on the ground.

On cross-examination, the Defendant testified that he developed the BCF record label, which was also a community outreach program for children. The Defendant agreed that the word "Crime" in the label's name could have negative connotations but that it was meant to help African-American children stay away from crime.

The Defendant testified that he was present during the shooting but that he did not see the shooting. The Defendant stated that no one went entirely into the woods and that the victim dropped the gun when they were behind nearby bushes. The Defendant said that he went to the scene because Mr. Ortiz was involved in the fight and that Ms. Foust believed she and the victim shared a child. The Defendant stated that Mr. Reed was the oldest of the BCF members. The Defendant said that he went to South Wood after the

- 22 -

incident, that Mr. Dean lived at South Wood, that he never discussed the incident with Mr. Dean, and that he did not see Mr. Dean.

The Defendant testified that he received death threats from "people in the neighborhood," that Mr. Caldwell told him people were threatening to kill the Defendant, and that he was in Chattanooga when his El Camino was set on fire. The Defendant acknowledged that he was initially dishonest during his interview. The Defendant said that he did not know Mr. Reed was dead until Investigator Riddle told him and that he did not want to implicate Mr. Reed. The Defendant agreed that he said it was his or the victim's life during the jail calls and that he did not state that Mr. Reed shot the victim. The Defendant said that he never intended to mention Mr. Reed to the police because Mr. Reed was his friend and was not a murderer.

The Defendant testified that he left for Chattanooga on the night of the shooting because he feared for his life but that he was not running from the police. The Defendant stated that he asked the officers why he was being arrested because he did not kill anyone. The Defendant said that he initially told officers that he did not know Mr. Reed in an effort to protect Mr. Reed.

The Defendant testified that he knew Willie Winston's nickname was "Big 6" and that although he knew of Mr. Winston, he did not know him personally. The Defendant denied telling a fellow inmate that he and Mr. Winston had Mr. Reed killed. The Defendant stated that Mr. Reed was his friend and that he did not disclose any information about the shooting to the inmate. The Defendant said that he tried to call other BCF members while he was in Chattanooga and that he spoke with Mr. Reed on the day after the shooting. The Defendant stated that Mr. Ortiz, Mr. Hill, Mr. Caldwell, and Mr. Reed were at the scene when he arrived. The Defendant acknowledged that he was untruthful multiple times during his interview. The Defendant said that he rode a bus to Chattanooga.

The Defendant testified that he was telling the truth about Mr. Reed because the victim's and Mr. Reed's families deserved to know the truth. The Defendant stated that he spoke with his brother by telephone on the day after the shooting and told his brother he was in Chattanooga. The Defendant stated that his brother said people were still threatening him and that his brother gave the phone to Mr. Reed. The Defendant said that Mr. Reed thought the Defendant had been shot because Mr. Reed was unable to see whether the Defendant or the victim retrieved the gun from the ground. The Defendant stated that Mr. Reed said the victim ran deeper into the woods and that Mr. Reed shot the victim. The Defendant stated that Mr. Reed's confession "didn't [sit] well" with him. The Defendant said that he took care of and fed the community.

- 23 -

The Defendant acknowledged that he said during a jail call that he was guilty of manslaughter. The Defendant stated that he had spoken with another inmate and that the inmate said the Defendant might be found guilty of manslaughter. The Defendant stated that he did not understand manslaughter because he had never been incarcerated and did not have a criminal record.

Investigator Riddle testified on rebuttal that he initially spoke with Mr. Dean on July 5, that he determined Mr. Reed had been missing since July 7, and that Mr. Reed's body was found on July 9. Investigator Riddle stated that Mr. Reed was alive at the time of Mr. Dean's interview.

On cross-examination, Investigator Riddle testified that he did not include a photograph of Mr. Reed in the photograph lineup shown Ms. Snavely. On redirect examination, Investigator Riddle reviewed a photograph lineup and stated that the lineup was created by trial counsel, that the lineup included a photograph of Mr. Reed, and that Ms. Snavely did not select Mr. Reed from the lineup. On recross-examination, Investigator Riddle stated that Ms. Snavely viewed the photograph lineup created by counsel three years after the incident. Investigator Riddle said that the photograph of Mr. Reed was taken four years before the incident and seven years before Ms. Snavely viewed the lineup.

Upon this evidence, the jury convicted the Defendant of first degree premeditated murder, and he received a life sentence. This appeal followed.

## I.     Sufficiency

The Defendant contends that the evidence is insufficient to support his first degree premeditated murder conviction because the State failed to establish that he acted with premeditation. The Defendant argues that he went to the scene unarmed, that he did not make declarations of an intent to kill the victim, and that the victim attempted to remove a gun from the victim's pants pocket or waistband. The Defendant asserts that the evidence does not support a conclusion that he "engaged in preparations prior to the shooting to provide for the concealment of the crime" and that the Defendant did not demonstrate calmness after the incident. The State contends that the evidence is sufficient to show that the Defendant acted with premeditation. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514,

521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1) (2014). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); *see* T.C.A. § 39-11-106(a)(18) (2010) (subsequently amended) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d) (2014). "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation. *See Bland*, 958 S.W.2d at 660. The list includes the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id*. (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

In the light most favorable to the State, we conclude that although the evidence of premeditation is not overwhelming, the evidence is sufficient to support the jury's determination that the Defendant acted with premeditation. The Defendant requested that Ms. Foust drive the Defendant to the scene of the fight because the victim had stolen from the Defendant. The victim and a group of men were fighting when the Defendant arrived at the scene, and the Defendant spoke angrily to the victim and "provoke[d] the

- 25 -

fight" between the victim and the other men. After falling on the ground, the victim stood, jumped over a car, and ran into the woods. At some point during the altercation, the victim attempted to remove something from his pants pocket, and Ms. Foust heard the Defendant ask the victim if the victim had a gun. Although the witness testimony was inconsistent relative to the number of people who ran into the woods after the victim, the Defendant admitted chasing the victim into the woods.

At the trial, the Defendant admitted shooting once at the victim. The victim sustained a single gunshot wound to the back of the head and abrasions caused from falling on the ground after being shot. In the jail calls, the Defendant admitted shooting the victim and stated that it was either him or the victim. The evidence showed that the men were at least three feet apart at the time of the shooting, and the victim's gunshot wound was consistent with the victim's running away from the Defendant. Although Ms. Foust testified that the victim never carried a gun, the Defendant had knowledge and experience with firearms, and he was seen with a firearm the day before the shooting. We note that appellate review of sufficiency of the evidence considers all of the evidence presented at the trial and does not exclude evidence that an appellate court later determines was admitted erroneously. *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981); *State v. Alley*, 968 S.W.2d 314, 316 (Tenn. Crim. App. 1997).

After the shooting, the Defendant returned to the Jeep with a gun, and Ms. Gibbs testified that the Defendant appeared "blank." The Defendant disposed of the gun used during the shooting, and he fled to Chattanooga until his arrest. The Defendant used a deadly weapon against an unarmed victim, who was running away from the Defendant at the time of the shooting. The Defendant provoked the fight that precipitated the shooting, appeared to lack emotion after the shooting, disposed of the weapon, and fled the jurisdiction. We conclude that the jury could have determined that the Defendant acted with premeditation. The Defendant is not entitled to relief on this basis.

## II. Admissibility of Evidence

The Defendant contends that the trial court erred by (a) permitting the State to refer to the Defendant as the leader of the BCF and by admitting testimony about criminal acts committed by other BCF members, (b) permitting Ms. Foust to testify about the Defendant's prior gun possession, and (c) permitting the State to imply during the Defendant's cross-examination that he directed the killing of a witness to the shooting.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401,

402. Questions regarding the admissibility and relevancy of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006). Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) prohibits the admission of evidence related to other crimes, wrongs, or acts offered to show a character trait in order to establish that a defendant acted in conformity with the trait. Tenn. R. Evid. 404(b). Such evidence, though, "may . . . be admissible for other purposes," including, but not limited to, establishing identity, motive, common scheme or plan, intent, or absence of mistake. *Id.*; *see State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Before a trial court determines the admissibility of such evidence,

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). The standard of review is for an abuse of discretion, provided a trial court substantially complied with the procedural requirements. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *see State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998).

- 27 -

## A. Testimony about the Black Crime Family

The Defendant argues that the trial court erred by permitting the State to refer to him as the leader of the BCF and by allowing the State to "elicit testimony regarding the criminal acts of other people affiliated with" the BCF. The Defendant asserts that the evidence was irrelevant and improper prior bad act evidence and that the admission of the evidence was not harmless. The State responds that the Defendant has waived appellate review of this issue because he failed to object during the trial.

We conclude that appellate review of this issue is waived because the defense did not object contemporaneously to the admission of the evidence. *See* Tenn. R. Evid. 103(a) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection[.]"); *see also* T.R.A.P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The Defendant is not entitled to relief on this basis.

## B. Testimony about the Defendant's Prior Gun Possession

The Defendant argues that the trial court erred by permitting the State to elicit testimony from Ms. Foust that she had seen the Defendant with a gun on the day before the shooting. He asserts that the evidence was inadmissible prior bad act evidence. The State responds that the court did not abuse its discretion by admitting the evidence.

During Ms. Foust's testimony, the prosecutor requested in a bench conference permission to question Ms. Foust about her knowledge of whether the Defendant carried a weapon and "went armed." The prosecutor noted that the Defendant had "made an issue over the fact that he did not carry a gun, that he wasn't carrying a gun then, [and] that nobody saw him with a gun." The defense did not object to the State's questioning Ms. Foust about whether the Defendant carried a weapon on the day of the shooting but objected to questions about the Defendant's "general character for carrying" a weapon. The prosecutor denied that her focus was the Defendant's character.

During a jury-out hearing, Ms. Foust testified that on the day of the shooting, she did not see the Defendant with a gun before the shooting occurred. She said that the Defendant could have had a gun but that she did not see a gun until the Defendant returned from the woods. She said that she knew the difference between a revolver and a semi-automatic handgun and that the gun the Defendant had after the shooting was black

and was not a revolver. She said that she had previously seen the Defendant with a firearm, that he had a gun every time she saw him, that the "hand part [stuck] out" slightly, and that she could not determine whether the gun the Defendant usually carried and the gun the Defendant had after the shooting were the same gun. She said that she saw the Defendant with a gun on the day before the shooting.

Regarding relevancy, the defense argued that Ms. Foust's proposed testimony did not rise to the level of showing the Defendant had a "habit of routine practice." The defense argued that the evidence only showed that the Defendant had carried a gun previously and that it was improper propensity evidence to use this evidence to show that the Defendant carried a gun on the day of the shooting. The defense objected to using the evidence to show that the Defendant brought a gun to the scene. The prosecutor said the evidence was relevant because the State's theory of the case was that the Defendant brought the gun to the scene, that nobody else was armed, and that the Defendant killed the victim for no reason.

The trial court stated that if Ms. Foust had stated she patted down the Defendant before he entered her Jeep before the shooting, the question of whether the Defendant had carried a gun previously would have been irrelevant. Defense counsel requested permission to elicit specific testimony about this and told the court that on July 5, Ms. Foust told the police that she ensured the Defendant did not have gun because her son was inside the Jeep and because she could "usually see" if the Defendant were carrying a gun. The court determined that the evidence sought by the State was relevant and that the defense could cross-examine Ms. Foust about ensuring the Defendant did not have a gun before driving to the scene. The court stated that it was relevant to refuting the Defendant's claim that he did not bring a gun to the scene and that the gun used during the killing was possessed by the victim.

The record reflects that the jury-out discussion centered on whether evidence of the Defendant's previous gun possession was relevant to whether the Defendant was armed before arriving at the scene. Although the defense also sought to exclude the evidence as inadmissible propensity evidence, the trial court solely relied on relevancy in determining that the evidence was admissible. In any event, we need not consider whether the evidence should have been excluded pursuant to Rule 404(b) because we conclude that whether the Defendant possessed a gun previously or on the day before the shooting was not relevant to showing whether the Defendant possessed a gun before arriving at the scene. *See* Tenn. R. Evid. 401, 402. We likewise conclude that the admission of the evidence was not harmless.

The Defendant was charged with first degree premeditated murder. Although he admitted shooting the victim, the State was required to establish beyond a reasonable doubt that the Defendant acted with premeditation. The State sought to establish this based, in large part, upon the Defendant's bringing a gun to the scene. The prosecutor's stated purpose for presenting evidence of the Defendant's previous gun possession was to refute the defense theory that the Defendant did not bring a gun to the scene and that the Defendant used the victim's gun to shoot the victim. Therefore, evidence showing whether the Defendant brought a gun to the scene was critical.

However, no evidence connected the Defendant's previous gun possession to the gun used in the victim's shooting. *See State v. Reid*, 213 S.W.3d 792, 813-14 (Tenn. 2006). Ms. Foust did not know if the gun previously possessed by the Defendant and the gun used during the victim's shooting were the same, and none of the testimony showed that the Defendant possessed a gun before he arrived at the scene. In fact, Ms. Foust testified that she ensured the Defendant did not have a gun before she drove to the scene because her son was initially inside her Jeep, and Ms. Foust said in her police statements that the Defendant did not have a gun before arriving at the scene. She testified that although she did not pat down the Defendant, she "made sure" and looked to determine if he were carrying a gun on his side. Likewise, Investigator Riddle admitted that none of the witnesses saw the Defendant with a gun before the shooting.

Furthermore, although we have concluded that the evidence of premeditation was sufficient, the evidence was not overwhelming. The Defendant shot an unarmed victim in the back of the head, disposed of the weapon, and fled the jurisdiction. The defense argued that the gun belonged to the victim, and Ms. Foust heard the Defendant ask the victim if the victim were reaching for a gun during the fight. There were no witnesses to the shooting, only to the fight. Ms. Foust testified that everyone was upset after the shooting and recalled that the Defendant appeared "agitated and nervous." The victim's killing was not particularly cruel, and the evidence did not show that the Defendant made any declarations of the intent to kill the victim before arriving at the scene or during the physical altercation. Ms. Foust's testimony only showed that the Defendant provoked the physical altercation before the victim ran into the woods. Likewise, the evidence did not show that the Defendant made any preparations before the killing to conceal the crime. The Defendant was with Ms. Foust and Ms. Gibbs before the shooting, and he requested Ms. Foust drive him to the scene after he received a telephone call informing him about the altercation involving the victim. The Defendant's explanation for leaving the jurisdiction was that his car had been firebombed, which was confirmed by the police, and that he had received death threats. The question of whether the Defendant procured a

firearm before arriving at the scene was critical to establishing premeditation in this case. As a result, we conclude that the erroneous admission of the Defendant's previous firearm possession was not harmless.

## C. Defendant's Cross-Examination

The Defendant argues that the trial court erred by allowing the State to "imply" that he "brought about or directed the death" of Mr. Reed. The Defendant asserts that the evidence violated Rule 404(b) because it showed that he had a propensity for violence and acted in conformity with this trait. He likewise asserts that the evidence violated Rule 403 because it was "substantially more prejudicial than probative." The State responds that the Defendant has waived appellate review of this issue by failing to object contemporaneously at the trial.

On cross-examination, the following exchange occurred between the prosecutor and the Defendant:

THE STATE: Nobody called you[?] Maniac didn't call you, Baltimore didn't call you, Big Al didn't call you, Big 6, do you know Willie Winston?

THE DEFENDANT: Not personally, no, but I know he's been around.

THE STATE: I mean you know Willie Winston, don't you?

THE DEFENDANT: I know he's been around, yes.

THE STATE: You rapped – you rapped with him. Baltimore knew him, he told the police he was part of your BCF. Your record label.

THE DEFENDANT: He may have been with Baltimore but he's not with me personally every day, no. I know of him, yes, I do.

THE STATE: You mentioned him to Julio Allen when you were in jail, didn't you?

THE DEFENDANT: I never told Julio Allen anything.

**THE STATE: You never told Julio Allen that you and Big 6 had J.R. killed?**

THE DEFENDANT: No, I did not.

The record reflects that J.R. referred to Mr. Reed. However, the defense did not object when the prosecutor questioned the Defendant about his involvement in Mr. Reed's death. *See* Tenn. R. Evid. 103(a)(1); *see also* T.R.A.P. 36(a). In any event, the Defendant raised this issue in his amended motion for a new trial. Our review is limited to plain error. *See Smith*, 24 S.W.3d at 274; *Adkisson*, 899 S.W.2d at 626.

Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641-42). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id*. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

The Defendant asserts that the prosecutor's question implying that he was involved in Mr. Reed's homicide was improper propensity evidence. The admission of prior bad act evidence pursuant to Rule 404(b) presupposes that the evidence at issue is relevant and, therefore, admissible but for the improper purpose of showing a defendant acted in conformity with a particular character trait. *See* Tenn. R. Evid. 402, 404(b)(4) ("The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice."). Evidence without probative value is not relevant and, therefore, is inadmissible. *See id*. 401, 402, 403. As a result, the central question is whether the prosecutor's question related to Mr. Reed's death was relevant. We conclude that it was not.

The prosecutor's question was an explicit attempt to show that the Defendant was involved in Mr. Reed's death, which occurred mere days following the victim's fatal shooting. Mr. Reed, like the victim, sustained a single gunshot wound to the head. The

- 32 -

Defendant admitted shooting at the victim. A critical issue in this case was whether the Defendant acted with premeditation in killing the victim, and we have already determined that evidence of premeditation was not overwhelming. Whether the Defendant played a role in Mr. Reed's killing was not relevant to showing whether the Defendant acted with premeditation in the victim's death. We conclude, as a matter of plain error, that the trial court erred in admitting the evidence. Because the evidence was not relevant, Rule 404(b) was not an applicable rule of exclusion.

When this evidence is considered in conjunction with the improperly admitted evidence of the Defendant's previous gun possession, evidence that Mr. Reed was shot in the head similarly to the victim, and the lack of overwhelming evidence of premeditation, we conclude that the prosecutor's attempt to connect the Defendant to Mr. Reed's death was not harmless.

## IV. Jury Instructions

The Defendant contends that that the trial court erred by providing the jury with a flight instruction. He argues that the evidence was insufficient to show that he was "hiding out" or that he intended to evade authorities because he voluntarily appeared in a Chattanooga court after the shooting. He asserts that he did not flee to avoid prosecution and that he left the jurisdiction because he received death threats and feared for his life. The State responds that sufficient evidence supported the instruction. We agree with the State.

A criminal defendant has "a right to a correct and complete charge of the law." *State v. Hanson*, 279 S.W.3d 265, 280 (Tenn. 2009) (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). A jury instruction related to general defenses is not required to be submitted to the jury "unless it is fairly raised by the proof." T.C.A. § 39-11-203(c) (2014). An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34.

The trial court provided the following instruction:

The flight of a person accused of a crime is a circumstance which, when considered with all of the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of

- 33 -

evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

*See* T.P.I – Crim. 42.18 (22nd ed. 2018).

In order to instruct the jury on flight, sufficient evidence must support the instruction. *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence supporting the instruction requires "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown.'" *State v. Burns*, 979 S.W.2d 276, 289-90 (Tenn. 1998) (quoting *State v. Payton*, 782 S.W.2d 490 (Tenn. Crim. App. 1989)).

The record reflects that, after the shooting, the Defendant fled the scene in Ms. Foust's Jeep and that Ms. Foust drove him to South Wood. The Defendant was no longer inside the Jeep when police officers conducted the traffic stop. The Defendant travelled to Chattanooga after the shooting and was arrested there on July 18. We conclude that the evidence was sufficient to support the flight instruction. Although the Defendant argues that he fled to Chattanooga because he feared for his life, "a defendant's specific intent for fleeing . . . is a jury question." *Berry*, 141 S.W.3d at 589. The Defendant is not entitled to relief on this basis.

- 34 -

In consideration of the foregoing and the record as a whole, we reverse the judgment of the trial and remand this case to the trial court for a new trial.


_____
ROBERT H. MONTGOMERY, JR., JUDGE